# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

TAMMY M. WORDAN,
o/b/o C.W.,                                  Plaintiff,

     v.                                                                                  6:16-CV-628
                                                                                    (ATB)

COMMISSIONER OF SOCIAL SECURITY,
                                              Defendant.

TAMMY M. WORDAN, Plaintiff pro se
PETER W. JEWETT, SPECIAL ASS'T. U.S. ATTORNEY for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y.G.O. # 18, in accordance with the provisions of 28 U.S.C. § 636 (c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 2, 5).

## I.   PROCEDURAL HISTORY

Plaintiff Tammy M. Wordan protectively filed an application for Supplemental Security Income ("SSI") payments on behalf of her grandson, C.W.,[1] on August 30, 2013, claiming a disability onset date of August 1, 1013. (Administrative Transcript ("T.") at 106-109). Plaintiff's application was initially denied on October 28, 2013. (T. 53-58), and she made a timely request for a hearing before an Administrative Law Judge ("ALJ"). (T. 59-61). The hearing, at which plaintiff appeared with C.W., was

---

[1] Throughout this Report, the child on whose behalf this action was brought will be generally referred to as "the claimant" or by his initials "C.W." Tammy Wordan, who commenced this action on behalf of her grandson, will generally be referred to as "plaintiff."

conducted by video conference before ALJ William M. Manico on October 8, 2014. (T. 33-42). In a decision dated October 22, 2014, the ALJ found that C.W. was not disabled. (T. 11-27). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 16, 2016. (T. 1-3).

## II. APPLICABLE LAW

### A. Disability Standard

An individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he or she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i). *See Hudson v. Astrue*, 1:06-CV-1342 (LEK/VEB), 2009 WL 1212114, at *3-4 (N.D.N.Y. Apr. 30, 2009) (discussing the standard for children's disability benefits). However, that definitional provision excludes from coverage any "individual under the age of [eighteen] who engages in substantial gainful activity. . . ." 42 U.S.C. § 1382c(a)(3) (C)(ii).

The agency has developed a three-step process to be employed in determining whether a child can meet the statutory definition of disability. 20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*, 02 Civ. 3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003). The first step of the test requires a determination of whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488. If so, then by statute

and by regulation, the child is ineligible for SSI benefits. 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b).

If the child has not engaged in substantial gainful activity, the second step of the test requires examination of whether he or she suffers from one or more medically determinable impairments that, either alone or in combination, are properly regarded as "severe," in that they cause more than a minimal functional limitation. 20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If the child is found to have a severe impairment, the Commissioner must then determine, at the third step, whether the impairment meets or equals a presumptively disabling condition identified in the listing of impairments set forth in 20 C.F.R. Pt. 404, Subpt. P., App. 1. *Id*. Equivalence to a listing can be either medical or functional. 20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed impairment, and the twelve-month durational requirement is satisfied, the claimant will be found to be disabled. 20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

"Functional" equivalence must be examined only if it is determined that the claimant's impairment does not meet or *medically* equal the criteria for a listed impairment. Analysis of functionality involves considering how a claimant functions in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). Those

3

domains include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established by finding an "extreme" limitation, meaning "more than marked," in a single domain. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).

Alternatively, a finding of disability is warranted if a "marked" limitation is found in any two of the listed domains. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. A "marked limitation" exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting

*Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

5

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. ISSUES IN CONTENTION

The plaintiff in this case has filed her federal action pro se on behalf of her grandson.[2] Ms. Wordan did not file a brief in support of her position by the deadline set pursuant to G.O. 18, notwithstanding a reminder notice from the court on June 21, 2016. Because the pro se plaintiff failed to file a brief, the court ordered defense counsel to file his brief first, and then gave plaintiff an opportunity to file a responsive brief. (Dkt. No. 11). Defendant's brief was filed on December 22, 2016, and plaintiff was sent a Text Notice advising her that, if she chose to file a brief, it would be due on or before February 6, 2017. (Text Notice Dated 12/22/16).

Plaintiff has failed to file any brief opposing defendant's arguments. However, in a Social Security action, the court has a duty to review the administrative record and

---

[2] While generally, non-attorneys may not represent other individuals in a court action, an exception has been made in Social Security cases where the court has determined that the non-attorney parent had a "significant stake in the outcome of the litigation," then the parent may bring an action in federal court on behalf of their child without an attorney. *Thomas v. Astrue*, 674 F. Supp. 2d 507, 511-12 (S.D.N.Y. 2009) (citation omitted). In *Thomas*, the court found that because any benefits received by the child would be paid to the pro se plaintiff as the child's "representative payee," the plaintiff had a sufficient interest to represent her child pro se in federal court. *Id.* The same is true in this case, and the court finds that plaintiff may represent C.W. pro se.

6

to determine whether the Commissioner's determination is supported by substantial evidence regardless of the parties' arguments. *See Marquez o/b/o Infante v. Shalala*, 898 F. Supp. 238, 241 (S.D.N.Y. 1995) (citing *Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir. 1990)). Therefore, the issue for this court to determine is whether the Commissioner's determination that C.W. is not disabled is supported by substantial evidence.[3] For the following reasons, this court finds that the Commissioner's decision is supported by substantial evidence and will dismiss plaintiff's complaint.

## IV. FACTS

Defense counsel has carefully and completely outlined the facts and medical evidence in his brief. (Def.'s Br. at 2-11). The ALJ has also included a detailed statement of facts in his discussion of plaintiff's case. (T. 17-20). Rather than reciting this evidence at the outset, the court will incorporate the facts as summarized by the defendant and the ALJ and will discuss the relevant details below, as necessary to address the issues.

## IV. THE ALJ'S DECISION

The ALJ found that C.W. was born on November 29, 2009, and was therefore, an "older infant" on August 30, 2013, the date that plaintiff filed the application on his behalf. The ALJ also determined that C.W. had not engaged in substantial gainful activity since that date. (T. 14). The ALJ found that C.W. had the following "severe" impairments: Attention Deficit Hyperactivity Disorder ("ADHD"); Cognitive

---

[3] In making this evaluation, the court also has a duty to ensure that the Commissioner has applied the correct legal standards. *Rodriguez v. Colvin*, No. 14-CV-727, 2015 WL 5794269, at *9 (E.D.N.Y. Sept. 30, 2015) (citing *Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004)).

7

Impairment, NOS;[4] and Adjustment Disorder, NOS. (*Id.*)  The ALJ found that C.W.'s allergies, separation anxiety, ear pain, and viral asthma were not severe. (T. 15).  The ALJ found that, even though plaintiff alleged that C.W. also suffered from autism and autism spectrum disorder, the record did not support a diagnosis for either impairment. (*Id.*)  C.W. was evaluated for autism, but there were no symptoms of autism noted during the examination, and two doctors ruled out these diagnoses.  The ALJ found that C.W.'s alleged autism and autism spectrum disorder were not "medically determinable impairments." (*Id.*)

The ALJ reviewed C.W.'s severe impairments under the standards articulated in the Listing of Impairments to determine whether C.W. had an impairment or combination of impairment that met or medically equaled the severity of a Listed Impairment. (T. 15).  The ALJ considered Listing 112.11 (ADHD); 112.02 (Organic Mental Disorder); 112.05 (Intellectual Disability); and 112.00 (Mental Disorders). 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 112.11, 112.02, 112.05, 112.00.  The ALJ found that C.W. did not meet the standard for any of these Listed Impairments. (T. 15).

Next, the ALJ considered whether plaintiff's had an impairment or combination of impairments that "functionally" equaled the severity of the Listings. (T. 15-27).  The ALJ considered C.W.'s limitations under each of the six domains and determined that even though C.W.'s impairments could reasonably be expected to produce the symptoms that plaintiff was alleging, "the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (T. 17).

---

[4] N.O.S. stands for "Not Otherwise Specified." http://medical-dictionary.thefreedictionary.com/NOS.

8

The ALJ reviewed plaintiff's testimony and analyzed the reports of plaintiff's teachers, social workers, psychologists, and medical doctors in making his determination. (T. 17-27).

Based upon C.W.'s test scores, his teacher's evaluations, and Dr. J. Meyer's[5] report, the ALJ determined that C.W. had "less than marked" limitations in acquiring and using information (T. 21-22), in attending and completing tasks (T. 22-23), in interacting and relating with others (T. 23-24), in moving about and manipulating objects (T. 24-25), and in caring for himself (T.25-26). The ALJ found that C.W. had no limitations in the domain of health and physical well being. (T. 26-27). Because C.W. did not have two marked or one extreme limitation in the six domains of functioning, the ALJ concluded that C.W. was not disabled as defined in the Social Security Act. (T. 27).

V. **ANALYSIS**

    A. **Substantial Evidence**

C.W. was referred for an evaluation by his daycare and his grandmother, due to concerns with following directions and attention. (T. 257). He was referred through the Committee on Preschool Special Education ("CPSE"). (T. 245). The evaluation was conducted to determine C.W.'s eligibility for special education services at the preschool level. (T. 257). He evaluated during October and November of 2012, by four

---

[5] Dr. J. Meyer is a State Agency non-examining pediatrician. (T. 45-51). Although Dr. Meyer did not examine C.W., the doctor reviewed many of the medical/educational reports which were prepared prior to Dr. Meyer's October 25, 2013 opinion. (T. 46-47).

9

professionals when he was two years and ten months old.[6] (T. 18, 239-46, 257). Each examination was conducted on a different date. (T. 257). He was evaluated at his day care facility and at home. (T. 239). The combined report was authored by the four examiners: Lisa Mixon, MS, CAS, school psychologist; Erica Hagan, MS. Ed., special education teacher; Erica Shaw, CCC-SLP, Speech/Language Pathologist; and Cynthia Fahey, Licenced Occupational Therapist. (*Id.*) A variety of tests were administered. (T. 239).

The report summary indicated that C.W. exhibited cognitive ability in the low range, while his adaptive skills were adequate. (T. 245). C.W. exhibited difficulty with fine motor tasks during the assessment process. (*Id.*) Expressive and receptive language skills were below average, but he had age-appropriate language communication skills, and his speech intelligibility was judged to be very good. (*Id.*)

After the above testing, the CPSE met on December 11, 2013 to review the results of the evaluation and issued its own report. (T. 247-54). The CPSE determined that C.W. qualified only for occupational therapy services as the result of this testing. (T. 247). The CPSE stated that "[C.W.] scored within average range on Psycho-educational and Speech/Language Evaluations. However, he demonstrated delays in fine motor skills. [C.W.] meets the eligibility criteria to be classified as a Preschool Student with a Disability due to fine motor delays." (T. 247). He was given an Individual Educational Plan ("IEP") based only upon his fine motor delays, and not based upon any cognitive or speech/language difficulty. (*Id.*) Occupational therapy

---

[6] (T. 257) lists the reason for the referral, four types of evaluations completed, the date on which they were completed, and the examiner who completed each evaluation.

10

three times per week was recommended. (*Id.*) The ALJ discussed this report at length and gave Dr. Mixon, and Ms. Shaw "significant weight."[7] (T. 18-19).

The CPSE report noted that C.W.'s learning might be slightly slower than his typical peers. (T. 249). He scored in the adequate range for socialization, demonstrated friend-seeking behavior, played near others, apologized for unintended mistakes, did not bully, and played with other children. (*Id.*) In fact, although testing showed a moderate delay in fine motor functioning, and a severe delay in sensory processing, the CPSE report noted that, if given time and the sensory input he needs, C.W. might be able to do many tasks that he was unable to perform during testing. (*Id.*)

On February 19, 2013, C.W.'s pediatrician, Dr. William Fuchs, M.D., stated that C.W.'s gross and fine motor skills were "normal." (T. 18, 171). Dr. Fuchs stated that C.W. could dump raisins from a small bottle, and copied a circle and a cross (fine motor skills). (*Id.*) Dr. Fuchs also stated that C.W. could pedal a tricycle, jump in place, balance on one foot, and alternated feet when going up stairs (gross motor skills). (*Id.*) His language development was listed as "normal" as was his "social development." (*Id.*)

In an April 5, 2013 update, the occupational therapist noted that C.W. was seeking out oral/sensory input by mouthing inappropriate objects, but a "chewy tube" was provided to assist with this problem. (T. 255). The occupational therapist also stated that C.W. required assistance with grasping writing utensils and in copying circles. (T. 256). He needed verbal cues to imitate block patterns, horizontal, and

---

[7] The ALJ also gave "significant" weight to the reports by Dr. Meyer and plaintiff's teachers. (T. 19).

11

vertical lines. (*Id.*) The therapist also stated that although his "eating" skills were not being addressed, C.W. had been engaging in strengthening activities to assist in developing the strength needed for developing the appropriate grasp on eating utensiles. (*Id.*) The update concluded that C.W. was "tolerating OT treatment well." (T. 255). The court notes that, on October 15, 2013, C.W.'s teacher stated that he had "no problems" in the domain of moving about and manipulating objects." (T. 144).

C.W. was evaluated on August 13, 2013[8] by Dr. Erik Jacobsen, Ph.D., a psychologist at the Kelberman Center for Autism Services. (T. 225-28). C.W. was three years and nine months old, and he was referred for a "diagnostic consultation to provide clinical impressions," based on plaintiff's concerns about C.W.'s attention, activity level, communication, and disruptive or oppositional behavior. (T. 225). Dr. Jacobsen used a variety of diagnostic tools, including a parent interview, a Family and Medical History Questionnaire, the Behavior Scale Assessment for Children, select items from the Autism Diagnosis Observation Schedule ("ADOS"), the Autism Symptom Rating Scale, and structured observation of the child. (T. 225). Dr. Jacobsen listed the plaintiff's concerns and noted her description of C.W.'s behavior at home. (T. 225-26). Dr. Jacobsen concluded that C.W. met the criteria for "unspecified [ADHD] - combined type," but did not meet the full diagnosis due to lack of symptoms at school. (T. 227). Although he met some of the criteria consistent with Autism Spectrum Disorder, they were "not present during the evaluation and at school." (*Id.*) Dr.

---

[8] The ALJ states that Dr. Jacobsen's evaluation was conducted on September 21, 2013. (T. 17). However, September 21, 2013 is the date of Dr. Jacobsen's report. (T. 228). The examination was actually conducted on August 13, 2013. (T. 225).

12

Jacobsen also stated that, given C.W.'s age, the ADHD diagnosis should be considered provisional, and that if the symptoms should emerge at school, the plaintiff should follow up with C.W.'s primary care provider for a possible change in diagnosis. (*Id.*)

Dr. Jacobsen noted that plaintiff made the transition from playing loudly in the hallway to the examination without difficulty, and that his play skills were adequate. (T. 226). Dr. Jacobsen expressed "mild concerns" with C.W.'s gait, but he gave good effort throughout the examination, even though he had some trouble with instructions. (T. 227). Significant concerns were noted with his attention, impulsivity, and hyperactivity. Expressive and receptive language skills appeared appropriate, even though mild articulation delays were evident. (*Id.*) C.W. was responsive to social gestures, he initiated a number of appropriate interactions, play skills were appropriate, and no significant stereotypical behaviors were noted. (*Id.*)

Dr. Jacobsen stated that C.W.'s daycare teacher, Ms. Luvera, reported that C.W. was doing "extremely well" since he entered school at the beginning of the summer. She reported no concerns with inattention, activity level, or impulse control. (T. 226). C.W. got along well with other students and was making academic progress. However, it does not appear that he reviewed any school psychological evaluations at that time. Dr. Jacobsen noted that C.W. was receiving occupational therapy three times per week to address his sensory issues. (*Id.*)

The ALJ cited a subsequent evaluation, dated July 30, 2014, signed by Carrie Corby, Licenced Master Social Worker and Andy Lopez-Williams, Licensed Clinical Psychologist. (T. 262-66). This report diagnosed C.W. with ADHD - combined type;

13

Cognitive Disorder (NOS); Separation Anxiety; and Adjustment Disorder. (T. 263). The reports stated that an additional diagnosis of Oppositional Defiant Disorder would have to be "ruled out." (*Id,*) However, the report also stated that C.W.'s grandmother indicated that he was exhibiting "clinically significant" emotional reactivity, sleep problems, attention problems, and aggressive behavior, while the report from C.W.'s teacher "indicated he is functioning within the normative range in all areas." (*Id.*) With respect to autism, although plaintiff reported that C.W.'s overall responsiveness was "moderately impaired," his teachers noted only a "mild" impairment. (*Id.*) Testing was not suggestive of autism spectrum disorder. (*Id.*) Medication was not recommended at that time because it was possible that C.W.'s functioning could be improved with behavioral treatments. (T. 264).

The ALJ discussed each domain individually, relying on Dr. J. Meyer's assessment of C.W.'s abilities. (T. 47-51). Although Dr. Meyer was a non-examining state consultant, this opinion was consistent with the opinion of C.W.'s teacher and with C.W.'s standardized testing scores. In a teacher questionnaire, dated October 15, 2013, C.W.'s teacher, Glorianne Keefe, noted some "obvious" problems in the domains of function; however, many of the problems cited were either mild or none. (T. 137-44). Ms. Keefe stated that C.W. continued to have difficulty acquiring new skills and retaining old ones. (T. 138). He also had difficulty processing information, particularly when given multiple directions, and he still needed assistance in becoming more independent. (*Id.*) Ms. Keefe also stated that C.W. could be independent if he chose to, but that he liked to have other people do things for him, and he could be uncooperative

14

when told to do things for himself. (T. 142). While it is clear that C.W. has difficulties, there is substantial evidence in the record supporting the ALJ's conclusion that C.W. does not have two "marked" limitations or one "extreme" limitation in the six domains of functioning.

### B. Credibility

#### 1. Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (citation omitted). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. §§ 404.1529(c), 416.929(c). When the

15

objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### 2. Application

The ALJ found that plaintiff was only partially credible in her description of the intensity and severity of C.W.'s limitations. The ALJ agreed that the evidence supported plaintiff's contention that C.W. experienced cognitive difficulties as the result of his ADHD. (T. 20). However, the ALJ correctly noted that plaintiff's description of C.W.'s behavior was more severe than what was seen by most of the examining professionals, including C.W.'s teachers.[9] (T. 20). The ALJ also stated that plaintiff's assertions were call[ed] into question because even though she complained on February 19, 2013 that C.W.'s behavior made it difficult to take him out in public,

---

[9] As discussed below, the only examiner who noted a behavior problem was the occupational therapist, Cynthia Fahey, who evaluated C.W. at home.

he was always cooperative at every treatment visit, and he had no issues at school.[10] (T. 18). While C.W. had some "obvious" problems in several of the activities listed in the teacher questionnaire dated October 15, 2013, there were no activities in which C.W. had "serious" or "very serious" problems, many were listed only as "slight" problems, and some were listed as "no problem."[11] (T. 138-42).

In his August 13, 2013 evaluation, Dr. Jacobsen stated that "concerns were indicated with inattention and hyperactivity at home and during his occupational therapy sessions." (T. 235). Plaintiff reported that C.W. could be aggressive with adults when limits were set and that he had "significant tantrums when not getting his way." (*Id.*) She also reported that C.W. would bang his head on hard surfaces when frustrated. (*Id.*) However, Dr. Jacobsen noted that "according to his teacher, Ms. Chris Luvera, [C.W.] has been doing extrememly well since entering the school at the beginning of the summer. She reported no concerns with inattention, activity level, or impulse control. He gets along well with other students and [is] making adequate academic progress." (*Id.*)

---

[10] The ALJ then cited Dr. Fuchs's February 19, 2013 examination as support for this assertion. (T. 18, 171).

[11] The categories of "making and keeping friends," "using language appropriate to the situation and listener, sustaining attention during play/sports, focusing long enough to finish assigned task, refocusing to a task when necessary, carrying out one-step instructions, waiting to take turns, changing activities without being disruptive, and working without distracting others, were all listed as "no problem." (T. 139). In the domain of attending and completing tasks, C.W.'s teacher did not even assign any "obvious problems." (*Id.*) The limitations in this domain were either "none" or "slight." In the domain of acquiring and using information, plaintiff had more "obvious problems," but the limitations in comprehending oral instructions, comprehending and doing math problems, understanding and participating in class discussions, and learning new material, were all listed as "slight." (T. 138).

17

In a section entitled "Clinical Observation," Dr. Jacobsen reported that C.W. transitioned well from play to testing, and gave good effort throughout the evaluation, although he had "some" difficulty following directions. (T. 235-36). Dr. Jacobsen did note "significant concerns" with respect to inattention, impulsivity, and hyperactivity. However, C.W. was responsive to his name, his expressive and receptive language skills appeared appropriate, and only mild articulation delays were evident. (T. 236). C.W. was responsive to social gestures, initiated a number of appropriate interactions, his play skills were appropriate, and there were no significant stereotypical behaviors observed. (*Id.*) As stated above, Dr. Jacobsen concluded that C.W. did not meet the full diagnosis for ADHD "given the lack of symptoms at school," and there were no symptoms of autism spectrum disorder. (T. 236).

Erica Hagan observed C.W. at daycare. (T. 241). He was "eager" to engage with her, was able to play appropriately and functionally, and he made nice eye contact. C.W. was able to make smooth transitions from one activity to another, and he was able to follow directions with cues. His attention to task seemed adequate, and he used gestures and approximations to make his needs known. (*Id.*)

Speech-Language Pathologist, Erica Shaw stated that C.W. "easily transitioned away from his daycare providers and showed immediate interest with presented tasks." (T. 241). He attended to all evaluation tasks, including picture stimuli, with minimal cues. His speech was easy to understand and contained few errors. (*Id.*) There was "no delay" in his auditory comprehension. (*Id.*)

Cynthia Fahey, an Occupational Therapist, evaluated C.W. at home and noted

18

that his attention span was poor. However, after some time, his attention to task improved briefly. C.W.'s behavior during the testing was poor – he threw blocks and beads, and he refused to do some of the requested tasks. When the testing was finished, and plaintiff was answering questions, C.W. had "several melt downs." (T. 242). C.W. would "tantrum, calm, and within a minute or two was in another tantrum, screaming, kicking, hitting, throwing himself to the floor, and rolling around the room." (T. 242-43). Plaintiff reported that C.W. was "very controlling" with plaintiff's time and her "interactions with anyone other than him" may have been the problem. (T. 242). C.W.'s teachers did not notice this behavior, and the results were directly opposed to the speech pathologist's examination which appears in the same report. (T. 241-45). As a result of the testing, as stated above, C.W. was deemed eligible only for occupational therapy services based on the delay in his motor skills. (T. 247).

Conflicts in the evidence are for the fact finder to resolve. *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the trier of fact has the duty to resolve conflicting evidence); *Goodale v. Astrue*, 32 F. Supp. 3d 345, 355 (N.D.N.Y. 2012) (citing *White v. Comm'r*, No. 06–CV–0564, 2008 WL 3884355, at *11 (N.D.N.Y. Aug. 18, 2008) (citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir.1983)). The record in this case contains some conflicting evidence, and the ALJ correctly resolved conflicting evidence to determine that plaintiff's testimony regarding the severity of C.W.'s limitations was not entirely credible. It is clear that C.W. has severe impairments, but that the severity is not sufficient to meet the definition of disability for Social Security purposes.

**WHEREFORE,** based on the findings above, it is

**ORDERED**, that the Commissioner's final decision is **AFFIRMED**, and the complaint **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT.**

Dated: February 24, 2017

Hon. Andrew T. Baxter
U.S. Magistrate Judge